May it please the Court, my name is Richard Stevens and I'd like to reserve four minutes for rebuttal. Okay, you try and keep track and we'll try to help you. Okay, thank you. I'd like to focus on what I think are the two issues that I think are really at the heart of this case. And the first one is whether the NIGC can approve a gaming ordinance that allows Class II gaming anywhere without ensuring that that occurs on Indian lands as that term is used in the... Mr. Stevens, as I understand it, when the Indian Gaming Commission approved the NUCSAC's ordinance in 1993, it was contemplated that the tribe was going to build the casino in Deming, is that correct? That's correct. So nobody was thinking about the location of the Northwind, which is in Linden, is that... It's north of Linden, it's outside of... 20 miles away, off the reservation. Yes, absolutely. Okay, so to the extent that there was an obligation at the time that the ordinance was approved, you're not challenging the fact that the original casino was built in Indian country, are you? No, no we are not. Okay. We are not. So then the question becomes, does the Commission have an obligation to make a determination at some later time when the tribe decides that it is going to build another casino off the reservation? Well, I think that it does have that obligation. Where in the statute do you find that? But, again, that obligation is based upon the policies of IGRA, essentially. I think it is... Policy as opposed to statute? Well... Sort of the intent of the law, is that your argument? Well, I'm saying that in order to make IGRA work and ensure that gaming only exists on Indian lands, that that duty must spring when they later announce, we're going to put a casino somewhere off reservation. Can I... Let me ask you a practical question. Sure. If, as you suspect, the tribe is going to engage in full-scale casino operations, in essence class three gambling, they're going to have to enter into a compact with the state of Washington, are they not? That's right. And that compact is going to have to be presented to the Indian Gaming Commission for review and approval, right?  And at the time that that occurs, the commission will have to make a determination as to whether or not the casino is going to be operated on Indian land or trust land. That's our position. So won't you have an opportunity at that point to challenge the commission's decision with regard to the compact? That is only if it switches to class three gaming. I mean, that would only occur in that circumstance. Switches? Are you contending they are now engaging in class three or that they only... I thought they're class two. Well, what we have raised is they have indicated they are doing class two, and that's what they're authorized to do. We think there's some question as to whether or not they're moving to class three. But the premise of your suit really is that this is class two gaming, and that somehow you're allowed to bring a challenge in front of us now, raising the argument that they shouldn't be allowed to go forward without the commission deciding whether or not this particular parcel is Indian land within the meaning of the statute. That's your argument. That's exactly right. And in answering Judge Tolman's question about, you know, in order to make IGRA work, I would contend that the clear requirement is in the approval of the gaming ordinance, that in the approval of the gaming ordinance, the NIGC has to have particular sites, either a site or multiple sites, so that it can ensure that the construction of the site meets environmental requirements. Where in the statute do you see that? I mean, I understand that that would be a sensible statute. Is there anything in the statute that says before construction or approval of a particular sited casino, the commission must make a determination that this is on Indian land within the meaning of the statute? The statute is not that clear. Yeah. Then how do we find an APA violation for a duty that you say exists that we find nowhere in the statute? Well, it isn't that it's nowhere. I'm just saying it's not that explicit, but I'm not saying it's nowhere. Doesn't our case law say in order to make out an APA violation, you've got to establish a duty on the part of the agency either, in this case, to act? Because your theory is that they failed to act. So we have to find a duty. And the only way I know how to find a duty is to look at the law and see what Congress told the agency it had to do. The Congress told the agency that in approving a gaming ordinance, they had to ensure that the site would meet environmental considerations as well as operation and management. Now you just jumped to NEPA. I thought we were talking about IGRA. No, it's in IGRA. It is. In the approval of the gaming ordinance, the commission, the NIGC, must make sure that the construction and operation and maintenance of the gaming facility meets environmental consequences. And you can't do that if you don't know where it is. Now, in the brief on the other side, it's represented, and I don't see anything in your brief to say that it's not true. The custom is that the tribe tends to go to the commission seeking approval of an ordinance, generally speaking, without specifying where on Indian land the particular casino is going to be built. Is that right? Well, I don't know that that's generally the way most tribes come to the commission. I don't know that that's true. Is there a record one way or the other? The record is not clear on that. But I will admit that there is. That's what happened in this case. It is what happened in this case, and it has happened in other cases. The Erie County case, for example, and that is a case where the court said you can't have a non-site specific. That's a long opinion, and I struggled through it. Number one, it's class three gaming, and number two, there were very specific sites mentioned in the settlement agreement. I'll call it that. Maybe not specifically where within the city of Niagara Falls nor where within Buffalo, but I had trouble figuring out how to apply that case to this one. It's clearly helpful to you, but I'm not sure it's on all fours. Well, and I would say that the distinction between class two and class three gaming is not a difference in principle. It's just a difference in degree of gaming. Either has to be on Indian lands, and our position is that the court in Erie basically said we've got to know what the site is. We have to know what the site is in order to meet the requirements of IGRA. Mr. Stephens, can you help me with the language of the statute itself? I'm looking at Section 2710 of Title 25, and specifically with regard to I guess it's subsection B. B1 speaks about an Indian tribe may engage in or license and regulate class two gaming on Indian lands within such tribe's jurisdiction. As I read that statute, that suggests to me that it's the tribe that issues the license for the location once the gaming commission has approved the ordinance under subsection B.2. Am I reading the statute right? Well, tribes can. Yes, tribes can issue particular site-specific locations for casinos and gaming. Then let me ask you the question that's troubling me. In looking at those two provisions, it seems to me that if I accept your argument that it's the chairman of the Indian Gambling Commission that has to do it, you've read out B.1 that says that it's the tribe that licenses. Not at all. Our position is that the chairman, when approving a gaming ordinance, the gaming ordinance has to be site-specific or sites-specific. I'm not saying it has to be only one, but there has to be some identification of where this is going to occur. Subsequent to that, the tribe then issues license. Now, as you understand the statute, as you want the statute to work, and I'm kind of sympathetic here because this is not to my mind an entirely clear statute, nor is it in some ways entirely sensible in the way that it seems to be operating. So I'm trying to understand if you've got a workable way of reading the statute. Your understanding is, okay, so in 93, the commission approves the ordinance, and pursuant to that approval, the Class 3 gaming goes forward in Deming. Sometime later, the tribe decides it wants to do Class 2 gaming at this off-reservation site up near Linden. And that off-reservation site may or may not be Indian land within the meaning of the statute. I read the history of how that came to be land owned by Mr. Squilty. And I have no idea myself whether it's Indian land or not within the meaning of the statute. The tribe then, pursuant to the ordinance, says, well, we have the authority to approve Class 2 gaming without going back to the compact because it's not Class 3, and we can do it on Indian land. We think it's Indian land, and therefore we approve, we license this casino. Now, is there an obligation for the tribe to come back to the commission every time it wishes to site Class 2 gaming anywhere on Indian land? Is that your argument? No, no, it is not. So where's the obligation for the United States to get involved here after 1993? Our position is primarily that the NIGC, in 1993, should not have approved a gaming ordinance that said you can build one anywhere. That's the problem. I'm not saying anywhere. It said on Indian land. But with nobody to determine whether or not it is, in fact, on Indian land. But that's going to be true for any general approval. That is to say, we, the commission, authorize this ordinance that allows building of casinos on Indian land. But it would be unreasonable, I think, every time an ordinance comes like that in front of the commission by the NUCSACs or anybody else. I mean, they're going to have a lot of these from a lot of different tribes. For them to engage in essentially a survey of all land that the tribe might claim is Indian land within the meaning of the statute. That can't be right that in 1993 the commission had the obligation to decide the status of every piece of land potentially claimed by the NUCSACs to be Indian land. The NUCSACs, in proposing their gaming ordinance, should have identified the places where they had an interest in building a casino. That's so that the commission could fulfill its duty to make sure that the construction of an operation of the casino would meet environmental requirements. In other words, you're arguing that every ordinance that comes in for approval has to have a site-specific request for every possible casino. And if they want to come back for a casino not named in the initial ordinance, they've got to submit an additional ordinance? Amend their ordinance. And submit it back to the commission? Yes. And where's that in the statute? Again, it's back to the requirement that the chairman not approve a gaming ordinance unless they can ensure that it is on Indian lands and that the construction and operation and maintenance of the facility meets environmental requirements. You can't do that if you don't know where it's going to be. And it is contrary to the whole theory of the NICC's role in this enterprise to be able to say you can build wherever you think Indian lands may exist. But that's not what Congress said when it wrote the statute. It seems to me that a natural reading of the statute is that the Indian Gaming Commission approves the ordinance permitting the tribe to engage in gaming activities. That's what happened in 1993, and that's under B-2. Then when a site is selected, the tribe under B-1 issues the license and regulates the operation of Class 2 gaming casinos under the ordinance that has previously been approved by the Gaming Commission. Under that reading, there is no way for the NIGC to ensure that the gaming occurs on Indian lands. That's the problem. Well, there is, but it's awkward. That is to say they can bring an enforcement receiving later. Well, the problem is they can't if it's not Indian lands. And there's a big quagmire if the tribe says, well, this isn't Indian lands. You can't enforce against us. And that was something that the Erie Court brought up. But if that happens, I guess the commission can say, well, I guess it isn't Indian lands. And then they hand the tribe over to the tender mercies of the state, and the state is not going to be very nice. If it is trust land but still not Indian lands, I think there's a big question whether the state could even regulate it. But if it's trust land, that's Indian land within the meaning of the statute. No, it isn't. The statute says you have to have tribal exercise of governmental authority in addition to being trust lands. If it's reservation land, it's automatically Indian lands. I may have misread the statute, but I thought if it's trust land, that means it's a... No, there's a second requirement. We've used up all of your time. You've wasted another perfectly good hour, as the click and clack people say, but it was only 15 minutes.  Thank you. May it please the Court. Robert Longman representing the federal parties. I just want to start out with... You know, actually, let me... It was a facetious remark. I'm repeating click and clack the way you did not waste your argument. Just in case you... I misspoke. I did not intend... I did not intend any adverse comment on the quality of that argument. It was a very good argument. Yes, it was an excellent argument. I'm sorry if there was any facetiousness that went astray. Okay, I'm sorry. Mr. Longman, let me just add. I know you must have a big checklist from the questions my colleagues have asked, but let me give you what's on my mind, as you can add that in your presentation. Does IGRA place a duty on the federal defendants to decide whether a particular site, like Northwood Crossing, is on Indian lands before a casino there commences operations? I do not believe IGRA places that duty on federal defendants. IGRA limits... IGRA says that the casino to operate under IGRA has to be on Indian lands, right? Right. It places no duty on the federal defendants to ensure that. IGRA places a number of specific duties on the Gaming Commission and the Department of the Interior. One of them, the one that Plaintiff here is focusing on, is approval of a tribal gaming ordinance. It also speaks to management contracts and tribal state compact approvals. I understand. It doesn't say that a gaming ordinance has to be site-specific. Right. It does not say that the gaming ordinance has to be site-specific, and it does not say that in approving a gaming ordinance... When there's a non-site-specific ordinance, like here, like the one approved in 1993, then a site is chosen. Does the federal agency charged with enforcing IGRA, the Gaming Commission, do they have to take any action to ensure that the site is on Indian lands? Well, there's nothing mandated in the statute that speaks specifically to the Indian lands determination. That's why I'm asking you, because you're the government. It, however, grants the Gaming Commission broad enforcement authority in 2713. Okay, so if we have, like, an impoverished tribe somewhere in the United States, and they go and hawk up to their eyeballs to build a casino, is the commission going to then step in and bring in enforcement action after the casino is all built and say, you can't do this? If a tribe built a casino on non-Indian lands as defined under the statute... So they'd have a right... Or on Indian lands that are not eligible for gaming under the statute. So they'd have a right to do that, but it seems so incongruous and like such a bad way to run a system. That's why I'm asking, isn't there some implied duty on the commission to make an Indian lands determination before the casino is built? I don't think there's an implied duty. There is a way, however, for a tribe to avoid that situation. If they're concerned about whether the casino they're considering is going to be on Indian lands or not, if they submit a ordinance that specifies the site, that then will be reviewed by the defendants to determine whether it's Indian lands or not. So it's not that a tribe is just left with two choices, build a casino and then hope for the best it doesn't get shut down, but rather it can trigger this up front by... If they get a general ordinance that's not site specific, is the tribe pretty much free to build their casino anywhere subject to whatever these risks are? There's nothing under the statute that prohibits... that requires an assessment of that up front. So the tribe then could go about building its casino subject to then either NIGC enforcement or state enforcement. It seems like a strange way to run a railroad, but go ahead and make your... I mean, I agree there's some strangeness here, but I think it is critical that a tribe... Let's say the tribe here was concerned about this parcel. It could have submitted a revised gaming ordinance to NIGC and that would have then... That said, by the way, we're planning to now game on this parcel, and then they would have gotten their determination of whether they're on Indian lands or not. So it's in the tribe's hand, and I think... That's true, but of course the way you're framing this, it makes the federal authority's role totally responsive and passive. If the tribe doesn't initiate that, then the federal agency doesn't have to do anything, right? Well, it still has to do what's specified under 27B2, and it lists there subsections A through F, the six factors the commission is to consider in approving an ordinance. And none of those six, say, make a determination of whether it's on Indian lands or not. I think that's a critical omission. Let me ask you this, and it kind of follows along with the practical questions that Judge Gould is asking you, because I'm concerned more or less with the same set of things, which is that this doesn't seem very sensible. Ordinarily, you want to know up front, can I do it or can't I do it? Instead of going forward, investing a huge amount of money, building a large structure that, even putting to one side the amount of money the tribe might have invested, well, then you've got the structure, and what are you going to do with it if it can't be used? The ordinary way we deal with the system with something like that is we know up front you can do it or you can't do it, and if there's a critical question such as is this or is this not on Indian land, you'd think that would be determined at the outset. How easy is it to determine whether land is Indian land within the meaning of the statute? And maybe I would ask you to address, with the question of ease, I don't want to get into the detail, the Supreme Court's decision just a couple of weeks ago in the Carcieri case on what constitutes trust land. Where I'm coming from is I'm not sure it's an easy determination. Just briefly on the first part of the question, whether this is the wisest system Congress could have enacted or not, I think is a fair thing to debate, and I don't want to belabor the point, but I think if you look at the exact provisions in 2710, there's nothing there that says commission, make Indian lands determination before approving a gaming ordinance. On the second point of how difficult a question this is, I think lots of times it's very easy. It's squarely part of a tribe's reservation that the tribe's been recognized. But as a practical matter, I think it often becomes a very difficult question because the tribe will usually, well always will want to situate the casino where there's going to be the most commercial traffic, and that for many tribes is of course off the reservation. So the tribes in many instances will have a very strong impetus to put the casino off the reservation on land as to which there may be a question as to whether or not it's Indian land within the meaning of the statute. I understand the reservation is huge, and there are lots of places where you can put the casino without any question whatsoever, but that's often not where the tribe wants to do it because the reservation itself is isolated. And it can get very complicated. The Erie County case is a prime example of that where the tribe had land claims that were being settled. Congress was involved. The federal agencies were involved. The state was involved. As part of that global settlement of land claims that the tribe had, everyone worked out a way for the tribe to end up with additional lands that it planned to have the game on. But didn't Carcieri just raise the stakes for the tribe on the location of the Linden Casino? Well, it raised the stakes for the question of when tribes were recognized and whether they were recognized at the time the Indian Reorganization Act was enacted. So is the risk on the tribe here to follow up on Judge Fletcher's question? They may have just sunk a whole bunch of money. I don't know what the status is of construction, but they may have committed a huge amount of money onto a piece of property that may or may not be Indian land in light of Carcieri. I mean, Carcieri, I think, introduces a new, definitely a new wrinkle in this. This issue hasn't been presented in this case yet. No one has, you know, there's nothing in their complaint about the time that the tribe was either recognized or under federal jurisdiction. Well, I think that's because Carcieri comes out of the blue. Pardon my criticism of the Supreme Court, but that case is just, huh, where'd that come from? Well, the United States was not arguing for the decision that was accepted in Carcieri. So we're, I think, the Department of Justice and Interior and the Gaming Commission are in the process of determining how Carcieri applies going forward. And do you know, as far as I can tell, it's not in the record because it didn't seem to be relevant to anything, when the Nooksacks became a recognized and enrolled tribe? They, I believe, were recognized in the early 1970s. No. However, they were, there's Indian Claims Commission decisions and earlier decisions that note that they were occupying land that was covered by the Port Elliott Treaty of the 1850s. They didn't sign the treaty, but they were covered by it. They were then under the jurisdiction of a federal agent. And that's clear going back to the 19th century. So this question has not been litigated here. It likely, if it ever is to be litigated, might be complicated. And in your view, the only way this can be litigated is going to be if the commission decides to take an enforcement action against the tribe. Otherwise, it's not coming up? Well, this would not be an argument based on the, when the tribe was recognized and when it became under federal jurisdiction, and thus whether that. No, I'm sorry. I'm not asking the question of the merits of whether it is or is not Indian land. I'm asking how the question of whether it's Indian land might be litigated. And I think I read in your brief, the only way the question is whether it's going to be litigated if the tribe chooses to go forward and build pursuant to an ordinance. The only way it's going to be litigated is if the commission decides to bring an enforcement proceeding. Is that right? Well, that's definitely right in this context here. What I haven't thought through is if Carcieri somehow adds a new wrinkle to this that could create some sort of federal action that would then be challengeable at that time. I'm not sure. You know, a plaintiff might bring some different sort of claim rather than one based on the approval of the tribal gaming ordinance. Mr. Lumna, can you help me? I appear to be stuck on the language of the statute, but I'm really having a hard time understanding the interplay here. B2 says that the chairman shall approve any tribal ordinance or resolution concerning the conduct or regulation of Class II gaming on Indian lands within the tribe's jurisdiction. Does the tribe adopt a resolution to issue the permit for the Linden location, and does that then come back to the commission? Or can the tribe just issue a license under a previously approved ordinance? I believe the tribe can just issue a license under a previously approved ordinance. So when the statute speaks of tribal ordinance or resolution, that would be the, if you will, enabling act of the tribe adopting the ordinance, which the commission then is asked to approve? Then the commission reviews that to assess whether it satisfies what's set forth in A through F. In our reading of A through F, if you look at those factors, they're clear. It requires that the ordinance or resolution provide that the tribe has sole proprietary interests, that revenues are used for certain purposes, there's provision for audits, there's provision requiring that the ordinance or resolution provide for the construction and maintenance of the facility and the operation consistent with environmental and public health concerns, and also a system for background investigations. But all of those are based on what provide for a review of the ordinance by the commission, rather than a review of the actual site. Mr. Linden, is it true, I thought the brief said this on both sides, that non-site specific ordinances are more the rule than the exception? I don't believe it's in the record what the split is. I believe both clearly exist. I don't know what's in the majority. There are a significant number of both kinds. Part of what's troubling me is if you have a non-site specific ordinance, and if then the tribe can rightly or wrongly go build a casino anywhere with no intervention except discretionary intervention by the commission, it seems extremely untidy to say the least as to whether problems could develop for which there's no party can bring an action to get a review of this. But let's say that a tribe with a general ordinance wanted to put a casino right across the street from us here where the Madison Renaissance is, and they had no great case that that was Indian lands, but someone talked them into it as a money-making idea, or they believed they had an argument it was Indian lands. Can anyone challenge that other than the commission? Well, I think as Judge Fletcher mentioned earlier, if the commission says this is not Indian lands, if it's clear it's not Indian lands at all, then it's under the state of Washington's authority. Are there any places in the country where states have challenged casinos that were built on non-Indian lands? I'm not aware of any cases on that front. I believe states have taken actions and could, for example, go in and seize gaming machines that they thought were illegal if it was not on Indian lands. Anyway, I think this tidiness reflects, when you have three separate sovereign entities, the federal government, the states, and the tribes, trying to work out a system that accounts for all their respective interests and authority, it doesn't always result in the cleanest system, but that's what they've attempted to do. Following up again on Judge Gould's line of questions, do we know the frequency with which the commission brings enforcement actions? Have they ever brought enforcement actions against casinos that they contend are not on Indian land? Well, it would most likely be an action against a casino that may be on Indian land but not land eligible for gaming. That's what I mean, Indian land within the meaning of the statute. Right. I'm not aware of that. I don't know if any have been brought or if not. So it's not you saying that they haven't, you just don't know? I don't know. I'm trying to think of any of the cases. I don't think any of the cases I've read are in that posture, so I'm not sure. Counsel, go ahead. Go ahead, Judge Gould. Well, I was just going to ask this. I'm under the impression that the commission has some regulations relatively new that say it can ask a tribe to make an Indian lands presentation, but it doesn't seem to require that as a general, I guess, a matter of course. I think the fairest way to characterize the new regulations, which went into effect early last year, is that they require tribes to submit when they're issuing a license for a new facility, submit some information, including information that would facilitate review by the commission and possibly interior of whether the land is Indian lands or not. But I think that that regulation facilitates the commission's use of its enforcement authority by making the tribe send in information that they can then review. And those new regulations get around a little bit the problem of the whole thing happening, the whole casino being built before an enforcement action is then brought. And under the new regulations, does the commission, when this information is communicated to them, does the commission have the obligation to determine whether it is Indian land within the meaning of the statute? No. The regulation does not speak to – Do they have the power to do it? The commission believes it does. When it receives information that a license is being – when a tribe is issuing a license to a new site and submits information to the commission, the commission can then review it, and it believes it then has the authority to step in using its enforcement powers if that site is not going to be on. And under the reg, isn't it up to the commission, though, whether to ask for that information? If I missed – I'm not entirely sure. That's possible. If I misspoke earlier saying it's required, I'm not sure. The reg provides for that. Right. I'll check it again. But I was under the impression that the commission could ask a tribe to submit documentation on the Indian lands issue, but it wasn't required to do that. I'm not sure if it sets forth a system where the tribe initially provides some information and that triggers the opportunity for the commission then to follow up, or if it's just all discretionary on the commission to ask for information from the very beginning. Mr. Lemon, going back to Judge Gould's hypothetical of the casino across the street, would the determination of land title have to await an enforcement action by the state of Washington, which presumably would move to stop gaming activities on land that they thought was not Indian land, and at that point the tribe would raise the defense that this is Indian land and the tribe has issued a license to permit the casino to operate? I think that is one way that could play out, is that the state acts and the tribe would then – whatever action the state took, the tribe would either say it's – could defend by saying this is not under your jurisdiction. But when would the Indian Gaming Commission step in? If the tribe said to the state of Washington, you can't interfere with our operations here, this is an Indian trust land casino operation under our ordinance, what, if anything, would the Indian Gaming Commission do? Well, if the federal parties believed it was Indian lands, they would presumably intervene on the side of the tribe and tell the state that it was – didn't have jurisdiction to act there. If not, I'm not entirely sure how that scenario would play out. Who makes the land title determination? Do we initiate a quiet title action in King County Superior Court and ask a state trial court judge to examine the title? Well, somebody could bring such a suit and if the federal government determined that there was no federal interest in this land at all, no tribal land under trust of any sort, then I think the federal government would just sit the suit out. But it would depend on exactly – there's so many wrinkles with what exactly sort of land it could be and then whether that triggers an enforcement action by NIGC or if it left solely to the state or not. I take it that the alliance has not filed a quiet title action in Whatcom County Superior Court. I have not – I'm not aware of any such action. I'm not aware of any claim in district court here either. Thank you very much. Thank you very much. We've taken you over time. Mr. Stephens, you've saved some time, but we took the government over and you just take as much time as you need to say what you need to say. Thank you. Thank you, Your Honor. I'd like to respond perhaps to the last question about the quiet title issue. The Quiet Title Act – the federal Quiet Title Act does not allow us to bring suit to quiet title in a traditional way because there's an exception from the waiver of sovereign immunity to lands owned by the federal government for which there is some colorable claim related to Indians. So even though you assert that the Northwood Casino is operating on non-Indian land, the Whatcom County Superior Court does not have jurisdiction to resolve that question? Well, I don't know about the Whatcom County Superior Court issue, whether they would have jurisdiction over land which the federal government claims an interest. I know I can't get into federal court on that issue. Well, somebody must have jurisdiction to decide the question. Is it the Gaming Commission? Well, that's our position, and the Gaming Commission does. We've cited the letter from George Skabeen where he says the NIGC is going to make this determination. It's clear that the Gaming Commission does have the authority to make this decision in various instances. The question that you need answered is not quite that one. You want them to be obliged to make the decision. That's right. And you want them to be obliged to make it early on in the process. That's right. If you look at the statute, Section 2710, the one that has been cited plenty of times, and subsection B2 says that the chairman shall approve any tribal ordinance or resolution concerning the conduct or regulation of Class II gaming on Indian lands within the tribe's jurisdiction. And that is pretty broad language. Any tribal ordinance or resolution concerning gaming. But you know, that's so darn ambiguous once you really get down to the question that's in front of us. I mean, this is now not Indian gaming at all, but I'm, for example, saying, well, I hire this man and I approve that he should do anything, all the deliveries around town, provided he has a driver's license. But I'm not the licensing authority. I don't determine whether or not he has a valid driver's license. It's entirely possible that we could read that to say, well, listen, we approve anything on Indian land, but that doesn't mean we need to decide whether it's Indian land now. And I realize that. But I go on to the subsection E that the chairman, the NIGC, has to ensure that the construction and maintenance of the gaming facility, the gaming facility and operation of that gaming is conducted in a manner which protects the environment and public health. And I don't know how the chairman can do that unless he knows where it's going to be. If that's right, what that means is that the practice, which exists in sort of undetermined proportion of having a sort of general approval of an ordinance, allowing later licensing of individual site-specific things that are not mentioned in the initial ordinance, if we adopt your reading, that practice is not permissible. That's right. If it's a blanket build-it-anywhere kind of ordinance, if the ordinance says we want to build, well, here's an example. If the ordinance says we're going to build on Indian lands within the reservation, that would be a different question because reservation land is all Indian lands. But your second argument that the NIGC, in approving it, has to determine at the time of approval, this is your argument, whether or not environmental concerns are satisfied, the commission can't make that determination without knowing the site on which it's going to be built and something about what's going to be built there. So even if it's entirely on reservation land, so the question is not whether or not it's Indian land. Your argument is you've got to make that environmental determination at the time the ordinance is approved, and you can't do that unless you actually have the specific proposal and specific to the site in front of you. That's right. So that maybe proves too much. It also seems to be fatal to your statute of limitation issue because E says, for purposes of this section but not later than the date that is 90 days after the date on which any tribal gaming ordinance or resolution is submitted to the chairman. That suggests to me that you have six years plus 90 days in order to bring your action, running from 1993. Well, and we hadn't talked about statute of limitations until this point. Let me address that briefly. I mean, I think this case fits squarely within the differences between the Wind River case and the Shiny Rock case, and I think there is a significant factual distinction between the two, and it's basically the – I mean, they both involved wilderness areas and mining claims. In Shiny Rock, the decision was made, and then Shiny Rock moved in and said, we want to patent these mining claims. Wind River was a case where the claims preexisted the action. In Shiny Rock, it was a latecomer. In Wind River, it was not. And in our case, we are not latecomers. We're not moving into an area next to the casino. We're not moving into it. We were here. The casino comes to them. That's when we're injured, and that's when the statute of limitations. So you want us to follow Judge Leiby's opinion in Artichoke Joe? Yes. Yes, sir. I'd also like to briefly address the question about whether or not the trust – the Indian lands determination is an easy determination to make or not. And in that case, I think if it's reservation land, it's easy. It's either in or not. But if you're outside the reservation, it is, in fact, a difficult one. Carcieri makes it even more difficult, but I think it's difficult anyway. The First Circuit in the Narragansett case said that the governmental power question is a fact-intensive question. Did the tribe historically exercise governmental power on the property at issue? And then finally, Your Honor, I'd like to address this is not in the record. But this casino is built, but we don't know how it is open, but we don't know what future plans may be on this site. We don't know if it's completely built. We don't know those things. But because there are environmental consequences of that kind of building, we think it is implicit within the NIGC's duties to make an Indian lands determination so that can be reviewed. Okay. Thank you. Thank you, both sides. This doesn't decide the case, but I will say, and I think I can say it on behalf of the panel, very nice arguments on both sides. This is a tricky case. Thank you both.
judges: Fletcher, Gould, Tallman